Z.Z., by and through her mother E.Z.,     :
           Petitioner               :
                                  :
           v.                      : No. 311 C.D. 2016
                                  : Submitted: July 22, 2016
                                  :
Pittsburgh Public School District,     :
           Respondent              :

BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION BY**
**SENIOR JUDGE COLINS**                **FILED: November 30, 2016**

Z.Z. (Student), by and through her mother E.Z. (Parent), petitions this Court for review of the January 30, 2016 order of the Special Education Hearing Officer (Hearing Officer) for the Pennsylvania Department of Education, Office of Dispute Resolution, concluding that the Pittsburgh Public School District (District) did not violate the Individuals with Disabilities Education Act (IDEA)[1] by delaying development of a final Individualized Education Plan (IEP)[2] for Student and offer

---

[1] 20 U.S.C. §§ 1401–1487.

[2] The IDEA defines an IEP as "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with," the mandates of Section 1414(d) of IDEA. 20 U.S.C. § 1401; *see also* 20 U.S.C. § 1414(d) (providing for evaluations, eligibility determinations, IEPs, and educational placements). The Pennsylvania Department of Education's implementing regulations define an "IEP" as "a written plan for the provision of appropriate early intervention services to an eligible young child, including services to enable the family to enhance the young child's development. The IEP shall be based on and be responsive to the results of the evaluation." 22 Pa. Code § 14.154(a).

of a Free Appropriate Public Education (FAPE).[3] For the reasons that follow, we affirm.

Pursuant to the IDEA, a local education agency (LEA) receiving federal funds must provide a student with a disability that gives rise to special education needs a FAPE based on that student's unique needs. 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1); 22 Pa.Code § 14.102; *Winkelman ex rel. Winkelman v. Parma City School District*, 550 U.S. 516, 520 (2007); *Big Beaver Falls Area School District v. Jackson*, 615 A.2d 910, 911–12 (Pa. Cmwlth. 1992). In order to ensure that a qualifying student is receiving a FAPE, a LEA must design and implement an individualized instruction plan set forth in an IEP, "which must be reasonably calculated to enable the [student] to receive meaningful educational benefits in light of the student's intellectual potential." *G.L. v. Ligonier Valley School District Authority*, 802 F.3d 601, 608 (3rd Cir. 2015) (internal citations and quotations omitted); *see also* 20 U.S.C. §§ 1401(9), (14), 1414(d); 34 C.F.R. §§ 300.320–300.324; 22 Pa. Code § 14.102; *Big Beaver Falls Area School District*, 615 A.2d at 911–12.

If an IEP has been developed for a student and the student's parent is not satisfied that the IEP meets the student's unique educational needs, both the student's parent and the LEA may seek review by filing a due process complaint

---

[3] The term 'free appropriate public education' means special education and related services that:

> (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the [IEP] required under section 1414(d) of [IDEA].

20 U.S.C. § 1401(9); *see also* 20 U.S.C. §§ 1401(26) (defining related services) & (29) (defining special education); 20 U.S.C. § 1400(d) (purposes of IDEA).

and requesting an impartial due process hearing.[4] 20 U.S.C. § 1415(f); 22 Pa.Code § 14.162(b). If a hearing officer finds that the LEA failed to provide a FAPE for a student and that failure to provide a FAPE caused substantive harm to the student, the harm may be remedied by an award of compensatory education in an amount reasonably calculated to put the student in the position the student would have been if the district had met its obligation to provide a FAPE. *B.C. v. Penn Manor School District*, 906 A.2d 642, 650-51 (Pa. Cmwlth. 2006); *Stroudsburg Area School District v. Jared M.*, 712 A.2d 807, 809 (Pa. Cmwlth. 1998). Substantive harm occurs where a LEA's procedural violations of the IDEA: (i) impeded the student's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision making process regarding the provision of a FAPE to the student; or (iii) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii).

Parent filed a due process complaint against the District, as the LEA responsible for providing educational services to Student, on May 28, 2015 alleging that the District failed to provide Student with a FAPE in violation of the IDEA and seeking, among other remedies, compensatory education and placement at Western Pennsylvania School for the Deaf (WPSD). On June 6, 2015, the District responded to Parent's due process complaint alleging that its attempts to comply with the IDEA and provide Student with a FAPE were frustrated by Parent and requesting that Parent be ordered to consent to an evaluation of Student and engage with the IEP team in developing an appropriate IEP for Student. Following

---

[4] Prior to the due process hearing being held the parties must participate in a resolution session, or waive or agree to end a resolution session. 20 U.S.C. § 1415(f)(1)(B)(i); 22 Pa.Code § 14.162(q). The parties may also agree to participate in a mediation process. 20 U.S.C. § 1415(e), (f).

3

multiple hearings and an interim decision limiting the scope of Parent's claim to the 2014-15 school year, the Hearing Officer issued a well-reasoned, thorough decision on January 30, 2016 containing findings of fact and conclusions of law. In accordance with the decision, the Hearing Officer issued the following January 30, 2016 order:

> 1. The District did not propose a final offer of FAPE for Student, and did not make a placement decision.
>
> 2. The District did not delay development of a final IEP for or offer of FAPE to Student.
>
> 3. Within ten calendar days of the date of this Order, the District shall invite [Parent] to an IEP meeting to be held within thirty calendar days of the date of this Order to discuss and develop a new IEP and, once finalized, to determine a placement. In that invitation, the District shall offer to [Parent] no less than three meeting dates within those thirty calendar days to convene the meeting of Student's IEP team.
>
> 4. Should [Parent] fail to respond to the IEP meeting invitation described in ¶2, or advise the District that she is no longer seeking to enroll Student in the District, no IEP meeting need be held unless and until [Parent] elects to seek re-enrollment.
>
> 5. The District is not ordered to take any further action.
>
> 6. Nothing in this Order should be read to prevent the parties from mutually agreeing to alter any of its terms, including the scheduling of an IEP meeting at a mutually convenient time.
>
> It is FURTHER ORDERED that any claims not specifically addressed by this decision and order are denied and dismissed.

4

(Hearing Officer's January 30, 2016 Order.)  Parent appealed to this Court for review of the Hearing Officer's order.[5]

Before this Court, Parent argues that the District violated the procedural mandates of the IDEA by failing to make a timely offer of FAPE to Student and that this procedural violation caused substantive harm to Student warranting the remedy of compensatory education.  The District contends that Parent's argument is based on an erroneous interpretation of the IDEA and its implementing regulations governing the timeliness for development and offer of an IEP and that Student did not suffer substantive harm for which the remedy of compensatory education would be warranted.

The federal implementing regulations for the IDEA mandate that each LEA ensure that a "meeting to develop an IEP for a [student] is conducted within 30 days of a determination that the [student] needs special education and related services," and that as "soon as possible following development of the IEP, special education and related services are made available to the [student] in accordance with the [student's] IEP."  34 C.F.R. § 300.323(c)(1) & (2).

In the instant matter, the Hearing Officer found that the District's obligation to hold a meeting to develop an IEP for Student was triggered in November 2014, when a District Supervisor of Special Education received an enrollment packet for Student for WPSD and an Application for Educational Assignment for Approved Public School.[6]  (Hearing Officer Op., Findings of Fact

[5] Our review of a Hearing Officer's Decision and Order is limited to a determination of whether constitutional rights were violated, whether errors of law were committed, and whether the decision is supported by substantial evidence.  2 Pa. C.S. § 704; *A.S. v. Office for Dispute Resolution (Quakertown Community School District)*, 88 A.3d 256, 261 n.5 (Pa. Cmwlth. 2014).

[6] The Hearing Officer's decision contains 54 findings of fact.  The Pennsylvania Department of Education's implementing regulations for the IDEA provide that a Hearing Officer's decision

(F.F.) ¶16.) Following receipt of the enrollment packet for WPSD and the Application, contact between the District and Parent commenced, and the District began collecting information about Student from WPSD, Student's current private school, and Student's previous education within the District. (*Id*. ¶¶16-17.) The District sent an invitation to Parent to participate in an IEP meeting in late November, which was not held, and again sought to meet with Parent on December 30, 2014, which also did not occur. (*Id*. ¶¶18, 25.) Although a formal IEP meeting did not take place, the District met with Parent at WPSD on December 2, 2014 and the District and Parent continued to hold discussions and exchange information throughout November and December. (*Id*. ¶¶17, 19-24.) Student continued enrollment in her current private school, and was not enrolled at WPSD or a school within the District during the remainder of the 2014-15 school year. (*Id*. ¶24.)

An IEP meeting was finally held in May 2015. (*Id*. ¶26.) The Draft IEP presented at the May 2015 meeting was based upon the document created for the December 2014 meeting. (*Id*.) At the May 2015 meeting, Parent informed the

shall include findings of fact and specify that "[a]lthough technical rules of evidence will not be followed, the decision shall be based solely upon the substantial evidence presented at the hearing." 22 Pa. Code § 14.162(f). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *E.N. v. M. School District*, 928 A.2d 453, 462 (Pa. Cmwlth. 2007) (internal quotations omitted). This Court's appellate review requires it to review the record and ensure that the findings of fact made by the Hearing Officer are supported by substantial evidence; it is not this Court's function to reweigh the evidence, and where our review determines that the findings made by the Hearing Officer are supported by substantial evidence, this Court is bound by those findings. *Id*. at 464. Parent's brief offers a lengthy recitation of the factual background giving rise to Parent's appeal, with citations to the record; however, Parent does not argue that the Hearing Officer's findings of fact are unsupported by substantial evidence. Our review of the record has led inexorably to the conclusion that the findings of fact made by the Hearing Officer have the support of substantial record evidence. Therefore, our review of the legal issues raised by Parent on appeal is bound by the factual findings made by the Hearing Officer.

District that Student had recently been diagnosed with diabetes and that Student had undergone additional evaluations that would provide the District with more information regarding Student's educational needs; the District also sought consent to conduct its own evaluation of Student. (*Id*. ¶27.) The Draft IEP presented at the May 2015 meeting included placement in Student's neighborhood school, although it was understood that the District's proposed placement was the District Middle School and that Parent's proposed placement was WPSD. (*Id*. ¶33.) The IEP team did not finish reviewing the Draft IEP at the May 2015 meeting and no decision on placement was made at the meeting. (*Id*. ¶¶32, 34.) Parent consented to an evaluation of Student at the May 2015 meeting and agreed to provide written input following the May 2015 meeting; however, Parent did not provide the IEP team with written input and qualified her consent for evaluation during the summer, as Student had been repeatedly evaluated and assessed throughout the year and was feeling the effects of her physical illness, and Student became unavailable for a period of time due to a death in the family. (*Id*. ¶¶32, 37, 54.) Following unsuccessful attempts to schedule an evaluation of Student in July and August 2015, the District was able to evaluate Student in the fall of 2015 and the District psychologist conducted an assessment of Student in November 2015, although this assessment was not completed prior to the final due process hearing. (*Id*. ¶54.) For the first half of the 2015-16 school year, Student continued enrollment at the private school she had been attending during the 2014-15 school year. (*Id*. ¶53.)

In addition to the enumerated findings of fact, the Hearing Officer concluded that the delay in holding the IEP meeting could not be solely attributed to either party. (Hearing Officer Op., Discussion at 16.) However, the Hearing Officer concluded that the "evidence overwhelmingly establishes that the parties

left the May 2015 meeting with the understanding that the Parent would provide input for and respond to the draft IEP, and that was not done." (*Id*.) Therefore, the Hearing Officer ultimately concluded:

> This was not a circumstance where the parties had reached an impasse such that the draft IEP should be considered the District's final proposal; nor does the record demonstrate that the District was requiring the Parent to continue negotiations indefinitely. There was one draft IEP, one IEP meeting, and a reasonable and agreed expectation that the Parent would provide written input into that draft for consideration by the team. Moreover, the Parent was plainly not denied the opportunity to participate meaningfully in that IEP development process. In short, the parties had not yet reached the point of a District firm offer of FAPE, and the draft IEP simply cannot be considered such a proposal.

(*Id*. at 17.)

The Hearing Officer's conclusions adhere to applicable precedent interpreting the IDEA. The United States Supreme Court has described the cooperative process the IDEA establishes to guide parents and LEAs in developing an IEP for a student with disabilities as "the core of the statute." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005). The parents of a student with a disability have a statutory right to serve as members of the student's IEP team; in developing the IEP, the IEP team must consider "the concerns of the parents for enhancing the education of their child"; and when decisions are made on the placement of a student with a disability, the IDEA mandates that "the parents of each child with a disability are members of any group that makes decisions on the

educational placement of their child." 20 U.S.C. §§ 1414(d)(1)(B), (d)(3)(A)(ii), (e). These provisions are part of a larger framework that mandates that LEAs significantly engage parents and families in the substantive development of an IEP and that the states establish procedures to ensure that LEAs are in fact engaging parents in the development of an IEP and providing a FAPE to students with disabilities. *See* 20 U.S.C. § 1415. Ultimately, however, the IDEA is directed at education providers and it is LEAs, not parents that are charged with carrying out its mandates; as the United States Court of Appeals for the Third Circuit concluded in *M.C. on behalf of J.C. v. Central Regional School District*, 81 F.3d 389 (3rd Cir. 1996):

> A child's entitlement to special education should not depend upon the vigilance of the parents…nor be abridged because the [LEA's] behavior did not rise to the level of slothfulness or bad faith. Rather, it is the responsibility of the child's teachers, therapists, and administrators—and of the multi-disciplinary team that annually evaluates the student's progress—to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly.

*Id*. at 397. In recognition of the LEA's ultimate responsibility to develop an IEP and provide each student with a disability a FAPE, the regulations implementing the IDEA permit an IEP meeting to be held without a parent or family where the LEA has established a record of attempting to engage the parent or family and been unable to convince the parent or family to attend the IEP team meeting and engage in the development of the student's IEP. *See* 34 C.F.R. § 300.322.

In the instant matter, we are presented with a factual scenario that remained uncontemplated by the statutory provisions of the IDEA and its

9

implementing regulations; the District did seek to accommodate and include Parent in the development of Student's IEP and Parent neither cooperated fully with the IEP process nor declined to engage in the process. The circumstances here were further complicated by the fact that Student was not enrolled in the District and therefore the District's ability to proceed in developing Student's IEP depended on Parent's involvement to a greater degree than if Student had already been receiving educational services within the District. This is not to say that a LEA's obligation to a student is lessened when the student is not enrolled in the district; the IDEA makes clear that it is a student's residency that triggers the school district's obligation and it is certainly reasonable and in accordance with the IDEA that parents, when possible, would not choose to enroll their disabled children as students within a school district without an IEP in place. *James v. Upper Arlington City School District*, 228 F.3d 764, 768 (6th Cir. 2000). However, such circumstances present practical challenges to a LEA's ability to unilaterally fulfill its obligations under the IDEA.

In *MM ex. rel. DM v. School District of Greenville County*, 303 F.3d 523 (4th Cir. 2002), the United States Court of Appeals for the Fourth Circuit held that the LEA was not subject to the remedy of compensatory education for the procedural violation of failing to have a completed and signed IEP when that failure was due to lack of cooperation by the student's parents, there was no evidence that the parents would have accepted the FAPE offered by the LEA if it did not include the placement desired by parents, and the evidence showed that the LEA's procedural defect did not result in any loss of educational opportunity for student. *Id.* at 533-535. An important piece of the analysis by the Fourth Circuit Court of Appeals in *MM ex. rel. DM* was the fact that the LEA was willing to offer

10

student a FAPE and did attempt to do so. *Id*. at 534. This is true in the present matter as well; the District showed willingness to offer Student a FAPE and did attempt to do so, however, its attempts were thwarted by its dependence on Parent's cooperation. Moreover, unlike the factual circumstances underpinning *MM ex. rel. DM*, the District here did not already have the benefit of IEPs from prior years and its own records of Student's past progress and evaluations. While *MM ex. rel. DM* is not binding on this Court, it is persuasive and offers support for the conclusion that a LEA's failure to complete the IEP process and make a firm offer of FAPE is not *per se* determinative of whether a student has been substantively harmed under the IDEA and that, instead, the circumstances leading to the breakdown of the IEP process must be examined in full.

We are further persuaded by *Systema ex rel. Systema v. Academy School District No. 20*, 535 F.3d 1306 (10th Cir. 2008), that an analysis of the circumstances leading to the breakdown in the IEP process is required to determine whether the failure of the District to make Student a firm offer of FAPE warrants compensatory education. In *Systema ex rel. Systema*, the United States Court of Appeals for the Tenth Circuit relied upon *MM ex. rel. DM* to conclude that the LEA's failure to present parents with a final IEP did not deny student a FAPE because:

> The hearing officer's findings of fact indicate that the [parents] unilaterally terminated the IEP development process due to their concerns about the [LEA's] plan to place [student] in an integrated classroom. The [parents] made this decision in spite of the fact that the [LEA] had not yet finalized its offer for educational services. While we do not fault the [parents] for making a difficult decision regarding which educational resources they believed would best benefit [student], that decision

11

precluded them from meaningfully participating in the complete IEP development process. Thus, we conclude that the lack of a final IEP did not substantively harm [student].

*Systema ex rel. Systema*, 535 F.3d at 1315; *see also Hjortness ex rel. Hjortness v. Neehnah Joint School District*, 507 F.3d 1060, 1066 (7th Cir. 2007) ("the parents' intransigence to block an IEP that yields a result contrary to the one they seek does not amount to a violation of the procedural requirements of the IDEA. To hold otherwise would allow parents to hold school districts hostage during the IEP meetings until the IEP yields the placement determination they desire").

In the instant matter, the Hearing Officer found that the delay in holding the initial IEP process was attributable to both parties, but that Parent's actions, or inaction, prevented the IEP from being completed and the District from making a firm offer of FAPE. The United States Court of Appeals for the Third Circuit addressed a similar situation to the facts presented here in *P.P. ex rel. Michael P. v. West Chester Area School District*, 585 F.3d 727 (3rd Cir. 2009), where the IEP process was begun but remained uncompleted prior to the student's transfer from one private school to a new private school that could better address the student's needs.

Parents in *P.P. ex rel. Michael P.* contacted the LEA during the 2004-2005 school year to seek special education services for student. *Id*. at 731-732. At the time, the student was enrolled in first private school and, as in the instant matter, the parents' contact with the LEA began the process of an exchange of information with the parents, first private school, private evaluators who had been retained by parents and the LEA, as well as the LEA's request for permission to evaluate and test student. *Id*. During this period, the parents also sought out

12

second private school and began the process to enroll the student in second private school, at which the student was accepted in the spring of 2005. *Id.* An IEP was completed for the student and a firm offer of FAPE was made to the student by the LEA prior to the start of the 2005-2006 school year; however, the IEP was completed and the offer of FAPE was made after the school year had begun at the second private school and the student had begun attending classes. *Id.* at 733. The parents did not approve the IEP offered by the LEA to the student and ultimately filed a due process complaint alleging that there was an unlawful delay between their request for special education services for the student and the completion of the IEP process for which compensatory education and tuition reimbursement were appropriate remedies. *Id.* at 733, 737.

The Court of Appeals for the Third Circuit concluded that the delay in the LEA's evaluation of the student in *P.P. ex rel. Michael P.* was unfortunate but that it did not impact the parents' decision to keep the student in the first private school and was at most a procedural violation that could not, standing alone, support an award of compensatory education. *Id.* at 738, 739; *see also* 20 U.S.C. § 1415(f)(3)(E)(ii). Regarding enrollment at second private school, the Court of Appeals for the Third Circuit concluded that tuition reimbursement was also not available as a remedy for the parents because the LEA offered a FAPE and the parents placed the student in the second private school anyway. *P.P. ex rel. Michael P.*, 585 F.3d at 739. In reaching this conclusion, the Court of Appeals for the Third Circuit addressed and distinguished the United States Supreme Court decision *Forrest Grove School District v. T.A.*, 557 U.S. 230 (2009), where the Supreme Court held that tuition reimbursement for a parent's unilateral placement of a student in a private school is appropriate where the district did not provide

13

student with a FAPE. The Court of Appeals for the Third Circuit concluded that *Forrest Grove* was inapplicable to the factual situation before it in *P.P. ex rel. Michael P.* because "the [LEA] did not deny the student a FAPE and [ ] the student not only never received special education services from the [LEA], but was never enrolled in the [d]istrict in the first place." *P.P. ex rel. Michael P.*, 585 F.3d at 739 n.4.

Here, the circumstances are different from *P.P. ex rel. Michael P.* because Student was not offered a FAPE; instead, the Hearing Officer concluded that the process stalled before a final IEP could be developed and a firm offer of a FAPE could be made to Student. However, the facts are similar to *P.P. ex rel. Michael P.* and distinguishable from *Forrest Grove* because Student was never enrolled in the District. Of significance, the Hearing Officer found that the inability to offer a FAPE was not attributable to the District, and specifically that the District did not delay making a final offer of a FAPE to Student or take actions that amounted to a denial of a FAPE. Therefore, although *P.P. ex rel. Michael P.* is not on all fours with the factual circumstances presented here, we do conclude that the facts are analogous to the delay in *P.P. ex rel. Michael P.* and that similar to *P.P. ex rel. Michael P.*, the delay in finishing the IEP process did not impact Parent's decision to keep Student enrolled in first private school and did not amount to a substantive violation of the IDEA.[7]

---

[7] *See also Great Valley School District v. Douglas M.*, 807 A.2d 315 (Pa. Cmwlth. 2002). In *Great Valley*, this Court held that absent a violation of the IDEA, a LEA cannot be compelled to assume any burden arising from an out-of-state private placement in which it did not participate, including burdens associated with the location. *Id.* at 317. In reaching this holding, we examined cases from other jurisdictions and concluded:

> Federal courts have uniformly held that in the absence of a
> violation of the IDEA, a unilateral private placement that interferes
> with a [LEA's] ability to evaluate a [student] imposes no burdens

on the [LEA]. *See Tucker v. Calloway County Board of Education*, 136 F.3d 495 (6th Cir.1998) (reimbursement denied to parents who had unilaterally placed their disabled son in a private school before the [LEA] was given an opportunity to develop an IEP for the child); *Patricia P.[v. Board of Education*, 203 F.3d 462, 569 (7th Cir. 2000) ]*; Schoenfeld v. Parkway School District*, 138 F.3d 379 (8th Cir.1998) (parents who unilaterally withdrew their disabled child from the public school and enrolled him in a private school without prior notification of the [LEA] were not entitled to reimbursement for the cost of their son's private education because the [LEA] was denied any opportunity to formulate a plan to meet his needs or to modify his IEP); *Schwartz v. The Learning Center Academy*, 2001 WL 311247 (W.D.Mich. 2001)(4:00–CV–42, filed January 17, 2001) (student not submitted to testing by personnel of school district's own choosing not qualified to receive programs under the Rehabilitation Act [of 1973, 29 U.S.C. § 794]); *L.K. v. Board of Educ*ation, 113 F.Supp.2d 856 (W.D.N.C. 2000) (unilateral withdrawal of child from public school without an opportunity to evaluate his needs and without an involvement of school officials in decision precludes tuition reimbursement); *Catlin v. Sobol*, 988 F.Supp. 85 (N.D.N.Y. 1997) (parents who unilaterally maintained their disabled child's educational placement in one state after they moved to a different state were not entitled to reimbursement for the cost of the child's education from their new state of residence since the [LEA] was not given an opportunity to develop an IEP). These cases were decided not on the extent of the [student's] problems but on the extent the [LEA] was deprived of the cooperative process preferred by the IDEA. Unilateral private enrollment is itself a departure from the cooperative placement process, and out-of-state unilateral enrollment is a greater departure.

*Great Valley*, 807 A.2d at 321. While the circumstances in the instant matter do not involve out-of-state placement, the principle at work in *Great Valley* is equally applicable here; courts across jurisdictions have concluded that, absent a violation of the IDEA, a parent's decision to unilaterally place a disabled student in private school without providing the LEA a fair opportunity to evaluate the student precludes an award of compensatory education. *Compare Florence County School District Four v. Carter*, 510 U.S. 7 (1993) (Parents who "unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk. They are entitled to reimbursement only if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the [IDEA].") (internal citation and quotations omitted).

15

Based on the facts found by the Hearing Officer, we hold that the circumstances in the instant matter amount to at most a procedural violation by the District that, standing alone, did not constitute substantive harm to Student which would warrant the remedy of compensatory education. The record here does not support the conclusion that the District impeded Student's right to a FAPE or Parent's opportunity to participate in the decision-making process regarding the provision of a FAPE, and the record is devoid of evidence that the District caused Student a deprivation of educational benefits. Our holding is limited to the factual circumstances presented in the instant matter and rooted in our conclusion that a LEA's failure to complete the IEP process and make a firm offer of a FAPE is not *per se* determinative of whether a student has been substantively harmed under the IDEA; rather, to determine whether a student has been substantively harmed by a LEA's failure to adhere to the procedural timeline for developing an IEP and making a firm offer of a FAPE, we must examine in full the unique factual circumstances of each case.

Accordingly, we affirm the Hearing Officer's order.


_____
**JAMES GARDNER COLINS, Senior Judge**

16

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Z.Z., by and through her mother E.Z.,   :
                 Petitioner   :
                             :
           v.               : No. 311 C.D. 2016
                             :
Pittsburgh Public School District,   :
                Respondent   :

## ORDER

AND NOW, this 30th day of November, 2016, the order of the Special Education Hearing Officer for the Pennsylvania Department of Education, Office of Dispute Resolution in the above captioned matter is AFFIRMED.

_____
**JAMES GARDNER COLINS, Senior Judge**