## DELAWARE VALLEY SCHOOL DISTRICT, Petitioner,

v.

## DANIEL G., by and through his parents and natural guardians, Robert and Mary G., Respondents.

Commonwealth Court of Pennsylvania.

Argued Nov. 5, 2001.

Decided May 23, 2002.

Reargument Denied July 17, 2002.

Andria L. Borock, Huntingdon Valley, for petitioner.

Herbert D. Hinkle, Lawrenceville, NJ, for respondent.

BEFORE: SMITH–RIBNER, J., FRIEDMAN, J., and JIULIANTE, Senior Judge.

OPINION BY Judge SMITH–RIBNER.

The Delaware Valley School District (District) petitions the Court for review of the May 9, 2001 order of the Special Education Appeals Panel (Appeals Panel). The Appeals Panel affirmed a Special Education Hearing Officer's decision to require the District to reimburse Robert and Mary G. (Parents) for tuition, boarding and transportation costs for their 13–year–old son Daniel's placement at the Oakland School, a private school located in Keswick, Virginia, and to require the placement to remain until the District offers Daniel an appropriate program. The hearing officer determined that the District did not offer an appropriate program for the 2000–2001 school year and that the Parents' unilateral placement was appropriate. The District contends that the hearing officer capriciously disregarded evidence in making her findings of fact, failed to apply the proper standard of law in determining the appropriateness of the

Parents' unilateral placement and failed to issue a reasoned decision.

Daniel suffers from a neurological "decoding disorder" that complicates his education primarily in the areas of reading, language arts and writing. Daniel's difficulties began at an early age. At three months, he was diagnosed with vision problems, specifically strabismus nystagmus. He was diagnosed as autistic at the age of nineteen months and was enrolled in an early intervention program. The autism diagnosis was eventually dropped, and Daniel entered a regular kindergarten program in the District, but he encountered difficulties there and failed to progress in the curriculum. Daniel attended 1st grade in a school in Virginia, and he was identified by the Virginia school system as eligible for special education as well as speech and vision therapy.

Daniel moved back to the District in 2nd grade, where he was placed in regular education with speech/language and vision support. Toward the end of that school year, the District conducted a Comprehensive Evaluation Report (CER) of Daniel, which found that: "Danny is functioning within the 2nd grade level of the curriculum in most academic areas. In reading and language arts, his instructional level is approximately at a late kindergarten to early 1st grade level." CER 4/25/1996. The District concluded that Daniel met the criteria for a classification of Specific Learning Disability in the areas of reading and language arts. In the 3rd grade, the District expanded Daniel's instructional areas to include math. In 4th grade, Daniel was still reading at a "borderline instructional level at the pre-primer level." CER 9/10/1997. In 5th grade, Daniel was reading at a grade 1.7 level. CER 4/12/1999.

On September 28, 1999, the Parents wrote to the District expressing their concern that Daniel develop reading skills in the coming school year (6th grade) and stating their intention to consider placing Daniel in a private school, for which they would ask the District to pay, if a plan could not be developed to meet Daniel's needs, taught by trained staff. In the CER conducted at the end of Daniel's 6th grade, the District reported that Daniel had achieved an ability to read somewhere between a grade 1.9 and a grade 3.3 equivalency.[1] CER 5/9/2000. The Parents agreed to the findings and recommendations of the CER. An Individualized Education Plan (IEP) meeting for Daniel was held on June 12 and 13, 2000. Among other things the IEP provided for Daniel to receive specially designed instruction of one period each day to work on phonemic awareness skills (Lindamood–Bell LIPS Program), daily periods of group instruction in language arts and reading in the special education classroom and flexible scheduling to permit additional one-to-one reading instruction as needed.

On July 7, 2000, the Parents wrote to the District expressing concern over Daniel's lack of progress and dissatisfaction with the IEP, which they considered "only a variation of what had been done in the past." The Parents asked that the District

1. The CER prepared by the School District at the end of Daniel's 6th grade reflected the following results from reading tests: on October 4, 1998 (grade 5), Daniel scored a grade 2.5 equivalency on the S.T.A.R. computer-adaptive reading test (S.T.A.R. test); on March 3, 1999 (grade 5), Daniel scored a grade 5 equivalency on the Kaufman Test of Educational Achievement (Kaufman test); on March 14, 2000 (grade 6), Daniel scored a grade 1.9 equivalency on the Kaufman test; on May 3, 2000 (grade 6), Daniel scored a grade 3.3 equivalency on the Kaufman test; on May 9, 2000 (grade 6), Daniel scored a grade 2.1 equivalency on the S.T.A.R. test; and on May 12, 2000 (grade 6), Daniel scored a grade 3.1 equivalency on the Houghton Mifflin Informal Reading Inventory.

consider placing Daniel in either the Maplebrook School in Amenia, New York or the Oakland School in Keswick, Virginia, which are private schools that specialize in remedial instruction in reading, spelling and written language. The Parents indicated that they were open to other suggestions and asked whether the District knew of any closer schools that specialized in reading instruction. The District responded in a July 17, 2000 letter that it did not anticipate a change in the recommended placement at the Dingman–Delaware Middle School for Daniel's 2000–2001 school year, and the District did not respond to the Parents' request for school suggestions.[2]

The District requested a due process hearing pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1487, on August 2, 2000 when it became clear to the District that the Parents had placed Daniel at the Oakland School. Hearings were held before the hearing officer in November 2000, January 2001 and February 2001. After considering the evidence before her and making findings of fact based upon it, the hearing officer concluded that the District did not offer Daniel an appropriate program. For the hearing officer, the central fact was that Daniel's programs and placements had not afforded him meaningful progress in reading during his five instructional years from grades 2 through 6. The hearing officer further concluded that the Oakland School is appropriate to meet

Daniel's extensive educational needs. Both parties had contributed to delay in the case, and so the equities balanced. Accordingly, the hearing officer ordered the District to reimburse the Parents for tuition, boarding and transportation costs for Daniel's placement at the Oakland School and to continue Daniel's placement there until the District offers him an appropriate program. The Appeals Panel denied the District's exceptions and affirmed the hearing officer's order.[3]

The District first contends that the hearing officer "capriciously disregarded" the District's proposed factual findings and that her decision "was not based on the weight of the evidence." District's brief, at p. 9. The District provides multiple examples where it contends that the hearing officer "distorted the evidence." *Id.* The District concedes that the findings are technically accurate, but it contends that the findings are incomplete because they do not include additional information favorable to the District. The District misapprehends this Court's appellate function. The capricious disregard standard of review, urged by the District, is appropriate only when the burdened party is the sole party to present evidence and does not prevail. *See Russell v. Workmen's Compensation Appeal Board (Volkswagen of America),* 121 Pa.Cmwlth.436, 550 A.2d 1364 (1988).

Because both parties presented evidence in this case, the Court's review of

---

**2.** The District offered to hold another IEP meeting before the start of the school year and requested that the Parents recommend dates and times. Dates were exchanged, but the IEP meeting was not held until November 2000. The parties dispute who is to blame for this delay.

**3.** The Court's review of an order of the Appeals Panel is limited to a determination of whether the adjudication is supported by sub-

stantial evidence and whether errors of law were committed or constitutional rights were violated. *Conrad Weiser Area School District v. Department of Education,* 145 Pa.Cmwlth. 452, 603 A.2d 701 (1992). The final arbiter of fact in this matter is the Appeals Panel and not the hearing officer. The Appeals Panel, however, chose to defer to the hearing officer's findings.

the factual findings is limited to determining whether the findings are supported by substantial evidence. *Conrad Weiser Area School District v. Department of Education*, 145 Pa.Cmwlth. 452, 603 A.2d 701 (1992). The District does not identify any finding made by the hearing officer that is not supported by testimony or other evidence in the record. The hearing officers' failure to make additional findings favorable to the District, or to characterize the findings in a way favorable to the District, does not render them unsupported. *Makris v. Bureau of Professional and Occupational Affairs*, 143 Pa.Cmwlth. 456, 599 A.2d 279 (1991). After carefully reviewing the record, the Court concludes that the hearing officer's findings are supported by substantial evidence.

The District next contends that the hearing officer and the Appeals Panel erred in determining that the program that the District offered to Daniel was not appropriate for him. In order to satisfy the statutory requirements and qualify for financial assistance under the IDEA, Pennsylvania has adopted the federal regulations relating to assistance to states for education of children with disabilities. 22 Pa.Code § 14.102. This includes satisfying the statutory requirement that Pennsylvania ensure all children with disabilities the right to a free appropriate public education (FAPE). As the United States Supreme Court explained in *Board of Education of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the key requirement of FAPE is that assistance be sufficient to permit the child to receive educational benefit from the instruction. According to the definitions contained in the Act, a "free appropriate public education" consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child "to benefit" from the instruction. Almost as a checklist for adequacy under the Act, the definition also requires that such instruction and services be provided at public expense and under public supervision, meet the State's educational standards, approximate the grade levels used in the State's regular education, and comport with the child's IEP. Thus, if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied, the child is receiving a "free appropriate public education" as defined by the Act. *Id.* at 188–189, 102 S.Ct. at 3042, 73 L.Ed.2d at 701.

The Supreme Court in *Rowley* specifically rejected the argument that the IDEA requires States to "maximize the potential of handicapped children 'commensurate with the opportunity provided to other children.'" *Id.* at 189–190, 102 S.Ct. at 3042, 73 L.Ed.2d at 701. The floor of opportunity provided by the IDEA is "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201, 102 S.Ct. at 3048, 73 L.Ed.2d at 708. The hearing officer's findings establish that the District developed an IEP for Daniel's 7th grade year that included, among other things, specialized instruction in the form of the Lindamood–Bell LIPS Program for phonic awareness. This is specialized instruction targeted specifically to Daniel's disorder. The precise extent of Daniel's actual progress is in dispute.

The hearing officer found that based on one set of data Daniel made 8 months of progress over a period of 21 instructional months. Based on data that the hearing officer considered more reliable, Daniel made 2 months of progress in reading over 10 instructional months. Although the Parents are, perhaps rightfully,

dissatisfied with this progress, these findings do demonstrate that Daniel has received some educational benefit from the District's program. The fact that Daniel has achieved more success in reading at the Oakland School does not establish the inappropriateness of the District's program. The FAPE standard does not require the District to maximize Daniel's potential commensurate with his peers. *Rowley.* Accordingly, the Court concludes that the Appeals Panel erred as a matter of law in concluding that the District failed to provide Daniel with an appropriate program. In light of this result, the Court need not consider whether the Oakland School was an appropriate placement for Daniel or whether the hearing officer rendered a reasoned decision. The order of the Appeals Panel is reversed.

## ORDER

AND NOW, this 23rd, day of May, 2002, the order of the Special Education Appeals Panel is reversed.

## DISSENTING OPINION BY JUDGE FRIEDMAN.

Because I agree with the determination of the Special Education Hearing Officer (hearing officer) and the Special Education Appeals Panel (Appeals Panel) that the Delaware Valley School District (District) did not offer Daniel G. a free *appropriate* education program, I respectfully dissent.

I understand that, in order to provide an appropriate program, states need only offer instruction that will "benefit" the child and need not "maximize the potential of handicapped children 'commensurate with

the opportunity provided to other children.'" *Board of Education of the Hendrick Hudson Central School District v. Rowley,* 458 U.S. 176, 189–90, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Nevertheless, unlike the majority, I cannot accept that a program must be deemed appropriate as a matter of law merely because the child "receives *some* educational benefit" from it. (Majority op. at 994, emphasis added.).

In this case, the hearing officer concluded that the District did not offer Daniel an appropriate program, basing that conclusion on the fact that "Daniel's programs and placements had not afforded him meaningful progress in reading during his five instructional years from grades 2 through 6." (*See* majority op. at 992.) Daniel's test results certainly bear this out [1] by demonstrating an ever widening disparity between Daniel's grade level and his performance level over time.[2] The District may not be required to maximize Daniel's learning potential; however, I would agree that the minimal "progress" evident here certainly is not indicative of an "appropriate" education program. Thus, I would hold that the Appeals Panel did not err in determining that the District failed to satisfy its statutory obligation to provide Daniel with a free appropriate public education, and I would affirm the order requiring the District to reimburse Daniel's parents for the cost of the private schooling that has proved so beneficial.

---

1. Indeed, the majority here concludes that the hearing officer's findings are supported by substantial evidence. (Majority op. at 992.)

2. The Comprehensive Evaluation Report (CER) that the District conducted indicated that, at the end of 2nd grade, Daniel's instruc-

tional level was late kindergarten to early 1st grade level. In 4th grade, Daniel was still reading at the pre-primer level, and in 5th grade, Daniel was reading at a 1.7 grade level. At the end of 6th grade, Daniel's ability to read lay somewhere between a 1.9 and 3.3 grade equivalency.