GREAT VALLEY SCHOOL
DISTRICT, Petitioner,

v.

DOUGLAS and Barbara M., Parents
and Natural Guardians of Sean
M., Respondents.

Commonwealth Court of Pennsylvania.

Submitted March 28, 2002.
Decided Sept. 12, 2002.

 

Jane M. Williams, New Britain, for petitioner.

Douglas and Barbara McCarson, respondent, pro se.

BEFORE: LEADBETTER, Judge, SIMPSON, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge SIMPSON.[1]

We are asked to determine whether a school district can be compelled to evaluate in place a self-destructive student unilaterally enrolled in an out-of-state school. We hold that in the absence of violation of law, a school district cannot be compelled to assume any burden arising from an out-of-state private placement in which it did not participate, including burdens associated with the location.

Sean M., born March 15, 1985, is a resident of the Great Valley School District (School District). At all relevant times he was a regular education student.

During his ninth grade year, Sean disclosed to school personnel and his mother that he had been raped. During the school year, Sean received private psychiatric therapy arranged by his parents, as well as support from various school personnel. He performed well during the ninth grade year.

The perpetrator pled guilty just prior to trial in July 2000. Thereafter, Sean's behavior began a downward spiral of self-destructive tendencies, including drinking, drugs and acting out. Between Thanksgiving and Christmas, 2000, Sean attempted suicide three times.

The School District received information from Sean's private psychologist that his

---

1. This case was reassigned to Judge Simpson on June 17, 2002.

parents were considering placing him at high school in California. In response, the School District proposed a multi-disciplinary evaluation for Sean, and a Permission to Evaluate form dated December 7, 2000, was sent to Sean's parents.

Following his third suicide attempt, Sean received in-patient treatment at Horsham Clinic from December 16, 2000 until January 4, 2001. On discharge, Sean was taken by his parents to a therapeutic wilderness program in Idaho. On February 16, 2001, following completion of the Idaho program, Sean was professionally escorted to CEDU High School, a private residential school in Running Springs, California. The School District did not participate in any of these placements. All decisions regarding placements from December 16, 2000 onward were made by Sean's family.

With the intent of ultimately obtaining tuition reimbursement for the California placement, Sean's parents signed the Permission to Evaluate form on February 23, 2001, and requested the School District to conduct any evaluation of Sean while he remained in California. When the School District declined to send personnel to California, the parents requested a due process hearing. After hearings and other procedures, a hearing officer rendered a decision on September 10, 2001, which found no violation of law by the School District but required the School District to conduct any evaluation of Sean within 60 days while he remained at the California placement.

On appeal to the Special Education Due Process Appeals Review Panel (Appeals Panel), the Appeals Panel distinguished various cases and affirmed the hearing officer's decision based primarily on "the imminent life-threatening condition presented by Sean's mental and emotional state." Certified Record (C.R.), Item 5, at 12 (footnote omitted).[2]

2. Regarding the "imminent life-threatening condition" upon which the Appeals Panel relied, the hearing officer made the following relevant findings of fact:

19. On March 27, 2001 Sean's treating psychologist in California, Saeed Soltani, Ph.D. wrote, " . . . due to Sean's current fragile mental status it is best for him not to travel back to Pennsylvania at this time which could cause him further regression. It is our recommendation that any form of assessment and or evaluation be performed at the CEDU facility for the sake of maintaining the harmony within his treatment program." (P–4)

20. Sean currently is diagnosed as having Dysthymic Disorder, early onset, Posttraumatic Stress Disorder, and Obsessive Compulsive Disorder. Prior to his removal from the community Sean drank a fair amount of alcohol. (NT 723–724)

21. Sean's treating clinical psychologist who has seen him weekly since mid-March believes that it is ill advised for him to leave CEDU prematurely to return to Pennsylvania, the environment that was toxic for him. (NT 724, 738)

22. Sean's treating psychologist finds him to currently be extremely fragile. He currently has unpredictable mood shifts taking his demeanor from calm to violent and/or fearful. He currently engages in self-mutilation. He engages in binging and purging. On occasion he has needed one-to-one surveillance to keep him from harming himself. (NT 725, 733, 735)

23. Sean's lingering paranoia makes him vulnerable to exacerbation of existing low self-esteem, self-doubt, shame and guilt and this exacerbation may trigger relapse into drugs and alcohol. (NT 729–730)

24. If Sean were evaluated at CEDU, any untoward reactions due to his paranoia could be handled within the familiar and safe therapeutic environment that functioning as a whole provides a safety net if he faces stressors that he has difficulty managing. (NT 730, 742–743, 748–749)

25. Being escorted by a parent or a CEDU staff member to Pennsylvania for an evaluation would not provide a sufficient safety net given Sean's current emotional status. (NT 749)

The School District appealed to this Court, contending that there is no legal basis to require it to conduct an initial evaluation while a child remains out of the state in a unilateral placement.

■ This Court's review of an order of the Appeals Panel is limited to a determination of whether the adjudication is supported by substantial evidence and whether errors of law were committed or constitutional rights were violated. *Delaware Valley Sch. Dist. v. Daniel G.*, 800 A.2d 989 (Pa.Cmwlth.2002). The final arbiter of fact is the Appeals Panel and not the hearing officer. *Id.* The Appeals Panel, however, may adopt the findings of the hearing officer. *Id.*

■ In order to receive certain federal funding, states are required under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400—1491*o*, to provide children with a "free appropriate public education," otherwise known as a "FAPE," in the least restrictive environment. *See* 20 U.S.C. §§ 1400(c), 1412(a)(1), and 1412(a)(5). A FAPE is defined as "special education and related services." 20 U.S.C. § 1401(8). A child in need of such special educational services is entitled to an Individual Education Plan (IEP), the responsibility for which is placed on the local educational agency. 20 U.S.C. § 1401(15). Parental participation in the development of the IEP is essential to its validity. *Douglas W. v. Greenfield Public Schools*, 164 F.Supp.2d 157 (D.Mass.2001).

■ A child's FAPE is usually provided either in a public school or in a private school mutually chosen by school officials and the child's parents. *See Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 12, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). If, however, school officials and parents do not agree on a child's IEP and the parents unilaterally place their child in a private school, the IDEA authorizes a court to order school authorities to reimburse the parents the costs thereof if it "ultimately determines that such placement, rather than a proposed IEP, is proper under the [IDEA]." *Douglas W.*, 164 F.Supp.2d at 161, *quoting Sch. Comm. of Burlington, Mass. v. Dep't of Educ.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). Thus, parents who unilaterally change a child's placement while in the midst of challenging a proposed IEP run the risk of a court determining that the placement is not proper. *Id., citing Sch. Comm. of Burlington, Mass.*, 471 U.S. at 373–74, 105 S.Ct. 1996.

■ Within the context of the development of an IEP and challenges to it, the IDEA contains a "stay put" provision:

(j) Maintenance of current educational placement

Except as provided in subsection (k)(7) of this section [placement in alternative educational setting], during the pendency of any proceedings conducted pursuant to this section, *unless the State or local education agency and the parents agree, the child shall remain in the then-current educational placement of such child,* or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

---

26. In CEDU's normal structure a student's return home is not considered until the student has been in the program roughly a year. Given's [sic] Sean's circumstances CEDU's director definitely would not recommend that Sean return home at this time. Sean might be ready for a home visit in about a year. (NT 746, 755) C.R., Item 9, at 6 (footnote omitted).

20 U.S.C. § 1415(j) (emphasis added). *See James v. Upper Arlington City Sch. Dist.*, 228 F.3d 764, 766 (6th Cir.2000). Obviously, Congress intended that during proceedings a child would remain locally available unless enrolled elsewhere by mutual agreement. While violation of the "stay put" provision does not constitute a waiver of claims to tuition reimbursement, *see Sch. Comm. of Burlington, Mass.* (unilateral placement in private in-state school), violation of the "stay put" provision does not enlarge the rights of parents. Stated differently, unilateral placement does not entitle parents to greater accommodation than what is available to parents who conform to the law and keep their child available locally.

■ Recognizing the statutory preference for public or cooperative private placement, courts have consistently held that unilateral private placement is undertaken by parents at their risk. *Florence County Sch. Dist.*, 510 U.S. at 15, 114 S.Ct. 361; *Sch. Comm. of Burlington, Mass.*, 471 U.S. at 373–374, 105 S.Ct. 1996. The Sixth Circuit Court of Appeals has identified a double risk.

> By unilaterally withdrawing their student from public school and requesting a due process hearing, parents assume a double risk. First, they assume the risk that their child's IEP will be found adequate, thus precluding their reimbursement. Second, they assume the risk that though their child's IEP was inadequate, the alternative placement they chose for their child will not be deemed an adequate education either, thus precluding their reimbursement. As noted above, the Supreme Court has determined that parents are entitled to assume such a risk and proceed in such a manner. Parents are not entitled, however, to delay a request for a due process hearing, incur tuition costs of their own choosing for several years (thus depriving the school district of a chance to fashion a less expensive acceptable alternative), and then ask the school district to fund whatever alternative they have pursued in the interim.

*James v. Upper Arlington City Sch. Dist.*, 228 F.3d at 769; *accord, C.M. v. Bd. of Public Educ.*, 184 F.Supp.2d 466, 485 (W.D.N.C.2002).

Notable is the recent case of *Patricia P. v. Bd. of Educ.*, 203 F.3d 462 (7th Cir. 2000). In *Patricia P.*, the mother of a child with "emotional and behavior problems" transferred the child to a private out-of-state school without any discussion with public school officials about possible accommodations. One week later, in an effort to obtain reimbursement for tuition costs, the mother requested a due process hearing to determine whether the out-of-state school was an appropriate placement. The mother "did not send [her son] back to the school district for evaluation." *Id.* at 469. She offered to allow school district staff to travel to the out-of-state school. *Id.* The hearing officer found that the mother deprived the school district of a reasonable opportunity to conduct an in-state evaluation. *Id.* Stressing the IDEA's preference for cooperative placement, the Seventh Circuit upheld the denial of reimbursement for unilateral placement. "[T]his Court will look harshly upon any party's failure to reasonably cooperate with another's diligent execution of their rights and obligations under the IDEA." *Id.; accord, C.M.*, 184 F.Supp.2d 466, 485.

The similarities between this case and *Patricia P.* are striking. In both cases a child was removed to a remote private placement without prior discussions with school officials about possible accommodations. In both cases, the school district requested the opportunity to perform an IDEA-required evaluation in the home

state. In both cases, the child was not returned to the home state for evaluation.

The Appeals Panel distinguished *Patricia P.* from this case on the basis of the severity of Sean's problems. However, the problems complicating Sean's return to Pennsylvania are the same problems that existed when Sean's parents removed him from Pennsylvania and sent him to private placement in Idaho and then California. The only change is Sean's location, a change in which the School District had no say.

Federal courts have uniformly held that in the absence of a violation of the IDEA, a unilateral private placement that interferes with a school district's ability to evaluate a child imposes no burdens on the school district. *See Tucker v. Calloway County Bd. of Educ.*, 136 F.3d 495 (6th Cir.1998) (reimbursement denied to parents who had unilaterally placed their disabled son in a private school before the school district was given an opportunity to develop an IEP for the child); *Patricia P.; Schoenfeld v. Parkway Sch. Dist.*, 138 F.3d 379 (8th Cir.1998) (parents who unilaterally withdrew their disabled child from the public school and enrolled him in a private school without prior notification of the school district were not entitled to reimbursement for the cost of their son's private education because the school district was denied any opportunity to formulate a plan to meet his needs or to modify his IEP); *Schwartz v. The Learning Center Academy*, 2001 WL 311247 (W.D.Mich.2001)(4:00–CV–42, filed January 17, 2001) (student not submitted to testing by personnel of school district's own choosing not qualified to receive programs under the Rehabilitation Act); *L.K. v. Bd. of Educ.*, 113 F.Supp.2d 856 (W.D.N.C.2000) (unilateral withdrawal of child from public school without an opportunity to evaluate his needs and without

an involvement of school officials in decision precludes tuition reimbursement); *Catlin v. Sobol*, 988 F.Supp. 85 (N.D.N.Y. 1997) (parents who unilaterally maintained their disabled child's educational placement in one state after they moved to a different state were not entitled to reimbursement for the cost of the child's education from their new state of residence since the local special education agency was not given an opportunity to develop an IEP). These cases were decided not on the extent of the child's problems but on the extent the school district was deprived of the cooperative process preferred by the IDEA. Unilateral private enrollment is itself a departure from the cooperative placement process, and out-of-state unilateral enrollment is a greater departure.

This Court has previously reached a similar conclusion. *Murphy v. Dep't of Educ.*, 94 Pa.Cmwlth. 430, 504 A.2d 382 (1986) (if parents will not make their child available or cooperate with school district so that it may be ascertained whether there is an appropriate program of in-state education, a demand for reimbursement for expenses incurred at an out-of-state school is not warranted); *see Welsch v. Dep't of Educ.*, 42 Pa.Cmwlth. 41, 400 A.2d 234 (1979).

▉▉▉▉ Given the foregoing authority, it is clear that those who unilaterally remove a child from public school and enroll him in a private remote placement do so at their risk. Where a school district does not participate in the decision to remove a child to a private remote placement, the school district assumes no risks or burdens. Therefore, all the expenses, costs and burdens associated with the unilateral remote placement are initially borne by those participating in the decision.

▉▉▉▉ We hold that among the burdens initially assumed by those unilaterally enrolling a child in a remote educational in-

stitution are burdens associated with the location of that institution. Where a school district has not participated in a placement decision, no burden associated with the location can be assigned to it. Thus, a school district cannot be compelled to assume any responsibility for evaluating a child while he remains outside Pennsylvania in a unilateral placement.

■ When the Appeals Panel placed all the responsibility on the School District here to overcome the location decision made by others, it committed error. In the absence of violation of the IDEA, there is no basis to impose any responsibility on the School District to overcome conditions created by the parents' unilateral placement decisions.

■ The Appeals Panel committed further error when it attempted to limit the School District's control over the means of evaluating Sean. It is clear beyond reasonable contention to the contrary that under the IDEA a school district has a right to use its own staff to evaluate a student, even over objections that the testing would harm the child medically or psychologically. *Andress v. Cleveland Independent Sch. Dist.*, 64 F.3d 176, 178–79 (5th Cir.1995). There is no exception to this rule. *Id.* at 179. The right of the school district to choose qualified professionals it finds satisfactory is unquestioned. *See Patricia P.; Johnson v. Duneland Sch. Corp.*, 92 F.3d 554 (7th Cir.1996); *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307 (9th Cir.1987); *Dubois v. Connecticut State Bd. of Educ.*, 727 F.2d 44 (2d Cir.1984); *Schwartz; c.f. Mifflin County Sch. Dist. v. Special Education Due Process Appeals Board*, 800 A.2d 1010 (Pa.Cmwlth.2002)(Appeals Panel erred in ordering School District to engage outside experts without supporting evidence in the record); *Saucon Valley Sch. Dist. v. Robert O.*, 785 A.2d 1069

(Pa.Cmwlth.2001)(Appeals Panel exceeded its authority by ordering School District to hire outside expert to participate in development of IEP). By compelling the School District here to consider "contracting with California-based personnel to complete the evaluation, making use of videotaping and/or videoconferencing, and/or conducting a review of records," the Appeals Panel departed from settled law.

■ Sean was not blessed with good fortune. He was blessed, however, with two parents who love him and support him and have acquitted their responsibilities to him with such grace as to make each of us question whether we could do as well. But we are denied the luxury of deciding this case on the basis of sympathy or respect for the parents and Sean. Rather, we must decide this case on an impartial application of the law: In the absence of violation of law, the School District cannot be compelled to assume any cost or burden arising from the unilateral remote placement of Sean, including burdens associated with the location.

For the stated reasons, we reverse the order of the Appeals Panel.

### ORDER

AND NOW, this 12th day of September, 2002, the November 2, 2001 Order of the Special Education Due Process Appeals Review Panel is reversed.

DISSENTING OPINION BY Senior Judge McCLOSKEY.

I respectfully dissent as I disagree with the majority's findings that the rights of a school district to conduct an in-state evaluation outweigh the rights of a child not to suffer further emotional trauma.

I initially wish to stress that the present case is one of evaluation and not one of

placement.[1] Further, I believe that the majority's opinion loses sight of the fact that this is a case of a child's right to a "free appropriate public education," including the right/need to special educational services, under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400—1490o. Instead, the majority focuses upon the removal of Sean M. (hereafter Sean) from the Great Valley School District (the District) by his parents, which removal the majority finds to have terminated the District's burden to evaluate a special needs child and develop an Individual Education Plan (IEP). *See* 20 U.S.C. § 1414. Further, the majority opinion essentially holds that parents are required to maintain a child in the appropriate school district, despite even the most dire of circumstances.

In that regard, a brief recitation of the facts in this case is necessary. Personnel from the District became aware of Sean's rape during his ninth grade school year. Sean received psychiatric therapy arranged by his parents. Nevertheless, the District did not seek to evaluate him at this time. Between Thanksgiving and mid-December of his tenth grade year, Sean made three suicide attempts. He was thereafter placed in the Horsham Clinic.[2] Following discharge, Sean was placed in a therapeutic wilderness program in Idaho and, ultimately, he moved to a private residential high school in Running Springs, California. Obviously, Sean's parents were under a great deal of distress during this period of time and were forced to make critical decisions rapidly which they felt were in their child's best interests.

After Sean's parents signed the permission to evaluate form, they requested that the District evaluate Sean in California. The District refused and Sean's parents requested a due process hearing before a Special Education Hearing Officer. At this hearing, Sean's parents presented the testimony of Dr. Saeed Soltani, Sean's treating psychiatrist in California. Dr. Soltani specifically testified that Sean's mental state was fragile, that he engages in self-mutilation, that he has unpredictable mood shifts, that he engages in binging and purging and that his lingering paranoia leaves him vulnerable to an exacerbation of his problems. The Hearing Officer relied upon this testimony in concluding that the District was required to evaluate Sean without returning him to this Commonwealth.

The District filed exceptions and the case proceeded to the Department of Education's Special Education Due Process Appeals Review Panel (Panel). The Panel denied the exceptions and affirmed the decision of the Hearing Officer based upon "the imminent life-threatening condition presented by Sean's mental and emotional state." (C.R., Item No. 5, p. 12). The Panel expressly noted the limited set of circumstances in this case, such as Sean's prior suicide attempts and his fragile emotional state, as testified to by Dr. Soltani. This Court is faced with the unrebutted testimony of the psychiatrist of the dangers to Sean, which I believe is sufficient to support the decisions of the Hearing Officer and the Panel.

Additionally, I believe that requiring parents of a suicidal child to keep that

---

1. Under the latter situation, in cases of unilateral placement, reimbursement by a school district is not be required. *See, e.g., Patricia P. v. Board of Education of Oak Park*, 203 F.3d 462 (7th Cir.2000).

2. Prior to Sean's placement in this clinic, his private psychologist informed the District of Sean's parents' consideration of placing him in a high school in California. Only then did the District forward a permission to evaluate form to Sean's parents.

child in the District, as the majority would so hold,[3] thereby ignoring the immediate needs of that child and the advice of treating medical professionals, is both incomprehensible and inappropriate. Furthermore, to require Sean's parents to return him to this Commonwealth in order to undergo an evaluation, even after his treating psychiatrist opined that it would be dangerous to do so, would place the parents in a position that is especially inconceivable.

We must remain cognizant of the fact that it is the child's right to education at issue in this case. In seeking out treatment for their son, Sean's parents were undoubtedly acting in a manner to protect their child's well being. I do not believe that their actions in this regard relieved the District of its burden to undertake an appropriate evaluation. Nor do I believe that, under the limited set of circumstances presented in this case, it was unreasonable to require the District to perform this evaluation outside of the Commonwealth. I believe the right to an appropriate education belongs strictly to the child and, therefore, I believe it is the duty of the school district to perform an evaluation.

Sean's parents based their decisions on the protection and welfare of their child. This Court should do no less.

For these reasons, I would affirm the decision and order of the Panel.

---

3. In its opinion, the majority cites to the so-called "stay put" provision at Section 1415(j) of the IDEA, 20 U.S.C. § 1415(j).